UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATTY CARAMBOT,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>NEW YORK CITY HEALTH AND<br>HOSPITALS CORP., *et al.*,<br>                              Defendants. | 24-CV-841 (JPO)<br><br><u>OPINION AND ORDER</u> |

J. PAUL OETKEN, District Judge:

Plaintiff Patty Carambot brings this action against Defendants New York City Health and

Hospitals Corporation ("HHC"), the City of New York ("City"), Patricia Yang, Virginia Fineran,

Jessica Laboy, Wilma Soto, and Louis Molina, asserting claims under 42 U.S.C. § 1983 and New

York Civil Service Law § 75-b.  Before the Court is Defendants' motion to dismiss the

complaint for failure to state a claim.  For the reasons that follow, the motion is granted in part

and denied in part.

**I.      Background**

**A.      Factual Background**

The following facts are taken from Carambot's complaint and are assumed true for

purposes of resolving this motion to dismiss.  *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41

(2d Cir. 2013).

Patty Carambot worked as a forensic clinical psychologist at HHC's Correctional Health

Services ("CHS") department from 2016 to 2023.  (ECF No. 9 ("Compl.") ¶¶ 6, 9.)  She

provided mental health care and treatment to detainees at Rikers Island Correctional Facility

("Rikers"), which is operated by the City's Department of Correction ("DOC").  (*Id.* ¶¶ 1, 6.)  In

2019, Carambot was promoted to CHS's Senior Associate Director/Senior Clinical Supervisor,

where she "supervis[ed] mental health staff for multiple [therapeutic housing units ("THUs")] and general population in [Rikers's George R. Vierno Center ("GRVC")]." (*Id.* ¶ 53.) Shortly thereafter, she also became "the Co-Director of Clinical Training for new staff, doctoral, social work and creative art therapy . . . students on Rikers Island." (*Id.* ¶ 54.) At all relevant times, Carambot's duties allegedly included "evaluating and performing scheduled examinations of patients and prescribing and providing mental health care and treatment to detainees" (*id.* ¶ 55), but not "formulating, implementing or providing feedback on CHS-wide policy" (*id.* ¶ 57). Carambot received "stellar" performance evaluations and "frequently worked over 40 hours a week, without overtime, to attend to her patients' needs." (*Id.* ¶ 59.)

Throughout her time at CHS, Carambot voiced many concerns about the treatment of mentally ill detainees at Rikers, including the "lack of adequate staff and dangerous changes in protocol and housing, overcrowding in Rikers [THUs], clinically inappropriate and unethical placement of patients, lack of an adequate number of mental health staff to properly monitor and manage patients, dangerous changes in protocol and housing of inmate-patients and the free and continuing flow of illegal drugs into THUs." (*Id.* ¶ 8.)

Specifically, in May 2022, Carambot complained to her supervisor Virginia Fineran, who served as the Director of Mental Health Services at Rikers, about "the deliberately indifferent medical treatment of mentally ill detainees, unethical moving of mentally ill detainees to units not clinically appropriate for them and poor working conditions for patients and staff in these units." (*Id.* ¶ 82.) On September 16, 2022, Carambot complained to Fineran again that "staff were being stretched thin" and that "her prior complaints . . . were not being addressed. (*Id.* ¶ 83.) Also in September 2022, Carambot criticized the opening of a mental observation ("MO")

unit in a GRVC building with enhanced security housing ("ESH"), because "it limited the movement of patients to the clinic and allowed for greater access to illicit drugs." (*Id.* ¶ 66.)

On October 22, 2022, E.T., a mentally ill detainee and a patient of Carambot, committed suicide in GRVC. (*Id.* ¶ 71.) On December 14, 2022, speaking to a reporter "who asked questions about the death of E.T.," Carambot discussed "the difficult-to-manage high census of detainees on the MO, the lack of adequate mental health and DOC staff to monitor and manage patients and the difficulties of having an MO in a building with ESH." (*Id.* ¶ 74.) Some of Carambot's comments were included in the news report on E.T.'s death. (*Id.* ¶ 75.) At that time, "Carambot was directed by HHC and CHS staff to not discuss issues with the overcrowding and lack of adequate mental health staff and deliberately indifferent medical treatment of detainees at Rikers with non-employees of the City and HHC." (*Id.* ¶ 76.)

In July 2023, DOC closed the largest jail on Rikers and folded all its THUs into GRVC. (*Id.* ¶ 85.) Carambot raised her concerns about this decision to HHC management, including CHS's Senior Vice President Patricia Yang, Carambot's supervisor Fineran, and DOC Assistant Commissioners Thomas Griffin and James Saunders. (*Id.* ¶ 89.) On July 6, 2023, Carambot emailed Yang and CHS's Chief Medical Officer Bipin Subedi to complain about "unethical, improper and unsafe practices, such as high mental health patient census in the face of staff shortage, placement of high-risk patients into her units, greatly decreased clinically informed decision-making and lack of staffing." (*Id.* ¶ 90.) On or around July 26, 2023, Carambot complained to Griffin about "staff and patients getting hurt due to unsafe practices and mental health patient moves," but Griffin responded dismissively that "jails will always be violent." (*Id.* ¶¶ 92-93.) Carambot alleges, upon information and belief, that her "complaints and concerns to Griffin were made known and reported to [DOC Commissioner Louis Molina]." (*Id.* ¶ 94.) On

August 21, 2023, Carambot sent an email to Fineran with similar complaints, writing that "[p]utting more high-risk patients into these units at this point is just asking for something horrible to happen." (*Id.* ¶¶ 95-96.)

On August 22, 2023, D.U., a high-risk patient of Carambot, "was found dead in his cell, allegedly after asking DOC officers for assistance hours prior." (*Id.* ¶ 97.) That day, Jonathan Levine, the DOC Assistant Commissioner for the Investigation/Prison Rape Elimination Administration Division, interviewed Carambot as a part of investigating D.U.'s death. (*Id.* ¶ 98.) Carambot shared with Levine her concerns about "overcrowding, deliberately indifferent medical treatment of mentally ill detainees, lack of staffing and drugs coming on the units" and specifically referred to her August 21 email warning to Fineran. (*Id.* ¶ 99.) Levine assured Carambot that he was close with Commissioner Molina and would report this information to Molina "to see if he could get something done." (*Id.* ¶ 100.) That evening, upon Levine's follow-up, Carambot forwarded him her August 21 email to Fineran "regarding her concerns about improper mental patient care at Rikers." (*Id.* ¶ 101.)

Also on August 22, 2023, distraught by D.U.'s death, Carambot emailed to "request[] discretionary administrative paid leave." (*Id.* ¶ 102.) On the next day, CHS's Chief Administrative Officer Jessica Laboy met with Carambot, with Senior Director of Employee and Labor Relations/Legal Stephanie Palmadesso in attendance. (*Id.* ¶¶ 33, 109-10.) At the August 23, 2023 meeting, Laboy told Carambot that "[Yang] wants to give you time to regroup and get your thoughts together to discuss the issues with your behavior." (*Id.* ¶ 110.) Upon Carambot's inquiry, Laboy explained that "your behavior" referred to Carambot's "email." (*Id.*) Laboy placed Carambot on administrative leave and stated that "it makes sense it feels punitive because it is." (*Id.* ¶ 111.)

On September 11, 2023, upon Carambot's return from administrative leave, Palmadesso, with Fineran present, presented Carambot with a three-month Performance Improvement Plan ("PIP"), allegedly based on her attendance and communications issues.  (*Id.* ¶¶ 113-15.)  Despite Carambot's refusal to sign the PIP, "HHC specifically directed Carambot to no longer express her concerns about the deliberately indifferent medical treatment of mentally ill detainees at Rikers to DOC or any others outside of HHC and CHS."  (*Id.* ¶ 119.)  One month later, on October 13, 2023, Palmadesso met with Carambot to terminate her employment.  (*Id.* ¶ 120.)  Carambot alleges that the City, HHC, Yang, Fineran, Laboy, Molina, and CHS's Senior Director of Human Resources Wilma Soto were all involved in the decision to terminate her.  (*Id.* ¶ 121.)  According to Carambot, although the purported reason for her termination was that her team was dissatisfied and "no one wanted to work with her," "many of Carambot's colleagues, including the Rikers warden, several supervisors, team members and students were vocally upset about her being fired and have complained in writing about Carambot's unlawful termination."  (*Id.* ¶¶ 122-23.)

### B.    Procedural History

Plaintiff filed the operative complaint in this action on February 6, 2024.  (Compl.)  Defendants moved to dismiss the complaint on May 7, 2024 (ECF No. 26) and filed a supporting memorandum of law (ECF No. 28 ("Mem.")).  Plaintiff opposed the motion on June 4, 2024.  (ECF No. 32 ("Opp.")).  Defendants replied in further support of their motion on June 25, 2024.  (ECF No. 43 ("Reply")).

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint need not contain "detailed factual

allegations," but it must offer something "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In resolving a motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the complaint, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

## III.    Discussion

Carambot asserts two causes of action: a 42 U.S.C. § 1983 claim for violation of her First Amendment rights[1] and a New York Civil Service Law § 75-b claim for retaliation. (Compl. ¶¶ 11-12.) Defendants raise three arguments in support of their motion to dismiss: (1) that Carambot's speech was not protected by the First Amendment; (2) that she has failed to establish either municipal or individual liability under Section 1983; and (3) that she has failed to plead a cognizable Section 75-b claim. (*See* Mem. at 12-25.) These arguments are considered in turn.

### A.    First Amendment

"To state a claim under Section 1983, a plaintiff must allege that defendants "acted under color of state law and that [they] deprived [her] of a right secured by the Constitution or laws of the United States." *Palmieri v. Lynch*, 392 F.3d 73 (2d Cir. 2004). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137 (2d Cir. 1999) (citing *City of Oklahoma*

---

[1] Plaintiff also claims to bring this action "pursuant to . . . 42 U.S.C. § 1988, providing for the protection of all persons in their civil rights." (Compl. ¶ 11.) Because Section 1988 provides for the discretionary award of attorney's fees to a prevailing party, the Court does not consider it at this stage.

*City v. Tuttle*, 471 U.S. 808, 816 (1985)).  Thus, the Court first analyzes whether Carambot states

a deprivation of her First Amendment rights, before turning to other components of her Section

1983 claims.

"To state a First Amendment retaliation claim, a plaintiff must establish that: (1) [her]

speech or conduct was protected by the First Amendment; (2) the defendant took an adverse

action against [her]; and (3) there was a causal connection between this adverse action and the

protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).

Defendants argue that Carambot has failed to plausibly allege the first and third elements.  (*See*

Mem. at 19-27.)

### 1.    Protected Speech

Because HHC is a "municipal corporation" (Compl. ¶ 17), the parties do not dispute that

Carambot is a public employee.  (*See* Mem. at 19; Opp. at 14.)  "It is by now well established

both that a citizen, upon entering government service, by necessity must accept certain

limitations on his or her freedom, and that upon accepting public employment, such employees

do not check all of their First Amendment rights at the door." *Jackler v. Byrne*, 658 F.3d 225,

234 (2d Cir. 2011) (quotation marks omitted).  Balancing these interests, a public employee's

speech is only protected if she "spoke as a citizen on a matter of public concern." *Garcetti v.

Ceballos*, 547 U.S. 410, 418 (2006).

### i.    Citizen/Employee Distinction

"[W]hen public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes." *Id.* at 421.  Accordingly,

"speech is not protected if it is part-and-parcel of the employee's concerns about his ability to

properly execute his duties." *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015)

(cleaned up).  As the Second Circuit has explained:

The inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule. Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two. Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision.

*Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012). The parties characterize Carambot's speech very differently in this regard. Defendants contend that Carambot's speech "consisted of general concerns about: (1) understaffing; (2) being stressed and overworked; (3) her staff's working conditions; (4) her patient[s'] physical locations within the facility; and (5) the access and quality of mental health care offered to her patients," all of which were made within her capacity as a public employee, not as a citizen. (Mem. at 20.) By contrast, Plaintiff contends that her speech concerned HHC "policies on closing sections of Rikers jails, opening an MO unit in GRVC, dealing with a steady flow of illicit drugs to inmates [and] handling overcrowding" (Opp. at 19), all of which fall outside of Carambot's job duties, which were focused on "prescribing and providing mental health care and treatment to detainees" (Compl. ¶¶ 55-57).

Courts also consider the existence of "a civilian analogue" in determining whether a public employee spoke as a citizen, although this factor is not dispositive. *See Montero v. City of Yonkers*, 890 F.3d 386, 397-98 (2d Cir. 2018). "Speech has a 'relevant civilian analogue' if it is made through 'channels available to citizens generally.'" *Matthews*, 779 F.3d at 175 (quoting *Jackler*, 658 F.3d at 238). Again, the parties dispute this factor. Defendants argue that Carambot's complaints were made internally to her supervisors at HHC and DOC—a channel not available to the public. (Mem. at 22-23.) Plaintiff counters that she went outside of her chain of command, raising her concerns to a reporter, a DOC investigator, and other "high-level HHC and DOC employees whose contact information is available online." (Opp. at 22.)

The myriad factual disputes here reflect the fact-intensive and context-dependent nature of measuring a public employee's speech against the scope of her official duties. As Plaintiff

correctly points out, the Second Circuit has "cautioned against granting a motion to dismiss when the scope of a plaintiff's official duties [is] at issue." *Brant v. New York City Health & Hosps. Corp.*, No. 17-CV-3801, 2018 U.S. Dist. LEXIS 5428, at *9 (S.D.N.Y. Jan. 10, 2018) (citing *Matthews v. City of New York*, 488 F. App'x 532, 533 (2d Cir. 2012) (summary order)). "Other courts in this Circuit have heeded this warning and declined to dismiss cases of this kind before discovery." *Id.* at *2-3, 9 (denying a motion to dismiss where a HHC corrections counselor at Rikers was fired after complaining to his supervisor and the New York State Department of Labor about improper blood-sample collection practices) (collecting cases). Indeed, most cases of dismissal on which Defendants rely for their official-duty argument were decided at summary judgment, not on motions to dismiss.  (*See* Mem. at 19-23; Reply at 6-9.[2])

Here, Carambot has alleged sufficient facts to survive a 12(b)(6) motion to dismiss. Carambot alleges that as Senior Associate Director/Senior Clinical Supervisor at CHS, her duties "included evaluating and performing scheduled examinations of patients and prescribing and providing mental health care and treatment to detainees."  (Compl. ¶ 55.)  None of her duties

---

[2] *See, e.g.*, *Weintraub v. Bd. of Educ. of City Sch. Dist. of New York*, 593 F.3d 196, 200 (2d Cir. 2010) (reviewing a grant of summary judgment); *Ross*, 693 F.3d at 302 (same); *Severin v. New York City Dep't of Educ.*, No. 23-732-CV, 2024 WL 1904574, at *1 (2d Cir. May 1, 2024) (same); *Kaye v. New York City Health & Hosps. Corp.*, No. 18-CV-12137, 2023 WL 2745556, at *2 (S.D.N.Y. Mar. 31, 2023) (granting summary judgment); *Gotfryd v. City of Newburgh*, No. 21-CV-4009, 2024 WL 1555693, at *1 (S.D.N.Y. Apr. 10, 2024) (same).  The only exceptions, where a First Amendment retaliation claim is dismissed on a Rule 12(b)(6) motion, involve much more clear-cut facts on the face of the complaint.  *See Reynolds v. City of New York*, No. 23-76-CV, 2024 WL 1043495, at *3 (2d Cir. Mar. 11, 2024) (summary order) ("Reynolds's Amended Complaint is devoid of any assertions articulating the nature of his job responsibilities and how his complaints fell outside of those duties."); *Dubois v. Beaury*, No. 21-2096-CV, 2022 WL 1701497, at *3 (2d Cir. May 27, 2022) (summary order) ("[Plaintiff's speech] referenc[ed] that [it was] made pursuant to Police Department policy and that he was required to conduct the investigation as part of his job responsibilities."); *Waronker v. Hempstead Union Free Sch. Dist.*, 788 F. App'x 788, 792 (2d Cir. 2019) (summary order) ("The complaint makes clear that rooting out corruption and mismanagement was part-and-parcel . . . of Waronker's daily responsibilities as superintendent." (cleaned up)).

allegedly involved "formulating, implementing or providing feedback on CHS-wide policy, such as policies on mental health care and treatment to detainees, clinically appropriate and ethical placement of patients, adequate number of mental health staff required to properly monitor and manage patients and housing of inmate-patients." (*Id.* ¶ 57.) And Carambot's speech allegedly concerned a variety of subjects beyond the scope of her day job, including the opening of a MO in GRVC, the housing arrangement of inmate-patients, and the flow of illegal drugs into THUs. (*E.g.*, *id.* ¶¶ 66, 95.) While these issues might have come to Carambot's attention through her employment and might have "impacted her ability to properly execute her duties" (Reply at 6-7), the Supreme Court has made clear that "[t]he First Amendment protects some expressions related to the speaker's job." *Garcetti*, 547 U.S. at 421. A public employee's speech is not unprotected simply because it "concerned the subject matter of [her] employment," *id.*, and "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech," *Lane v. Franks*, 573 U.S. 228, 240 (2014).

The Second Circuit reversed a grant of summary judgment based on analogous facts in *Matthews*. 779 F.3d at 167. Matthews, a police officer, allegedly experienced retaliation for complaining to his commanding officers about the arrest quota policy at his precinct. *Id.* at 173-74. The Second Circuit held that Matthews spoke as a citizen because "his job as a police officer consisted of radio runs, patrols, complaint reports, and other tasks involving enforcement of the law; it did not include reporting misconduct of supervisors [or] commenting on precinct-wide policy" that he "had no role in setting." *Id.* at 174. Similarly, Carambot alleges that her duties as a clinical psychologist at CHS included examining patients and providing mental health treatment, but did not include "uncover[ing] deficiencies" or "formulating, implementing or

providing feedback on CHS-wide policy" such as staffing and inmate-patient placement.[3] (Compl. ¶¶ 55-57.)  As to the "civilian analogue" consideration, the *Matthews* court concluded that "Matthews pursued the same avenue to complain about a precinct-wide policy as would a concerned civilian," because he "did not follow internal grievance procedures, but rather went directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints."  779 F.3d at 176.  Carambot has alleged even more here:  Not only did she take her complaints to top officers at CHS to whom she does not regularly report, such as Yang and Subedi (Compl. ¶ 90), but she also expressed her concerns to three DOC Assistant Commissioners, including one in charge of investigations (*id.* ¶¶ 89, 92, 98), and to a reporter who published her comments in the news (*id.* ¶¶ 74-75).  As in *Matthews*, the fact that Carambot "had better access to [these individuals] than would ordinary citizens" is immaterial as long as "the same or a similar channel exists for the ordinary citizen."  779 F.3d at 176.

Accordingly, Carambot has adequately alleged that she was speaking as a citizen for purposes of her First Amendment claim.  *See id.* at 174 ("We hold that when a public employee

---

[3] Defendants argue to the contrary that "as both a Director and a Supervisor [Carambot] was necessarily responsible for monitoring the performance of her subordinates and trainees, implementing [HHC] policies and procedures within the mental health units she oversaw, and providing feedback to her own managers about the practical realities of those policies."  (Mem. at 21.)  However, the "proper inquiry" into the scope of an employee's duties "is a practical one," since "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform."  *Garcetti*, 547 U.S. at 424-25.  Defendants' factual speculations based on Carambot's job title alone are divorced from the complaint and are exactly the kind of issue that should be resolved after discovery.  *See Buchanan v. City of New York*, 556 F. Supp. 3d 346, 359 (S.D.N.Y. 2021) ("[N]owhere do plaintiffs concede that their day-to-day work involved high-level policy formation and implementation . . . .  Instead, defendants' deduction appears to be drawn from plaintiffs' job titles alone.  This inference may be borne out in discovery, but dismissing the complaint based on formal titles alone would fly in the face of the functional approach required by precedent.")

whose duties do not involve formulating, implementing, or providing feedback on a policy . . . engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee."); *see also Dillon v. Suffolk Cnty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 204, 210 (E.D.N.Y. 2013) (holding that a medical doctor at the Riverhead Correctional Facility spoke as a citizen when she complained to county officials about "the deliberate indifference of medical treatment and the abuse of prisoners," because those complaints "referred to systemic mistreatment and corruption extending outside of her own personal duties and affecting inmates with whom she had no personal or job connection").

### ii.  Matter of Public Concern

"To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Jackler*, 658 F.3d at 236 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). On the one hand, speech that "primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern." *Id.* (cleaned up).  On the other hand, "a topic is a matter of public concern for First Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." *Id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004)).

As Carambot describes it, her speech falls within the latter category.  Contrary to Defendants' assertion, Carambot has done more than "make[] the conclusory allegation that her various workplace complaints were 'matters of public concern and a public health risk.'"  (Mem. at 23-24 (quoting Compl. ¶¶ 140-141)).  The complaint cites a New York Times article (Compl. n.1), which reported that "mentally ill detainees [at Rikers] have been subject to harsh

conditions, inhumane treatment and inadequate supervision," and that "[a]t least 18 mentally ill detainees have died by suicide, drug overdoses and other causes in the past three years alone." Jan Ransom & Amy Julia Harris, *How Rikers Island Became New York's Largest Mental Institution*, N.Y. Times (Dec. 29, 2023), https://www.nytimes.com/2023/12/29/nyregion/nyc-rikers-homeless-mental-illness.html.  The complaint also alleges that in 2022, the death of E.T. received news coverage that included Carambot's comments to a reporter (Compl. ¶ 75); in 2023, the death of D.U. led to an investigation by the DOC Assistant Commissioner for the Investigation/Prison Rape Elimination Administrative Division (*id.* ¶¶ 97-98).  The concerns about Rikers's treatment of mentally ill detainees, which garnered significant media and public attention, mirror Carambot's complaints about the "lack of adequate staff and dangerous changes in protocol and housing, overcrowding in Rikers [THUs], clinically inappropriate and unethical placement of patients, lack of an adequate number of mental health staff to properly monitor and manage patients, dangerous changes in protocol and housing of inmate-patients and the free and continuing flow of illegal drugs into THUs."[4]  (*Id.* ¶ 8.)

These factual allegations readily clear the threshold of "matter[s] of political, social, or other concern to the community."  *Jackler*, 658 F.3d at 236.  The Court agrees with Plaintiff that "[t]he ongoing crises at Rikers," "[t]he lives of inmates," "[a] flourishing drug trade within Rikers," and "[u]nderstaffing that results in human suffering and deaths" (Mem. at 25)—all subjects of Carambot's speech—are matters of public concern.  *Cf. Hale v. Mann*, 219 F.3d 61 (2d Cir. 2000) ("We conclude that as a matter of law, the report addressed a matter of public

---

[4] Carambot also alleges that during her time at HHC, due to various ethical and public safety concerns, "most of the forty psychologists employed by HHC at Rikers . . . had quit, leaving only seven psychologists remaining."  (*Id.* ¶ 80.)  This cuts against Defendants' suggestion that Carambot was merely raising a "personal grievance."  (Mem. at 24 (quoting *Montero*, 890 F.3d at 394).)

concern: the proper administration of State facilities for the incarceration of juveniles."). Because Carambot has adequately pleaded that she spoke as a citizen on matters of public concern, her speech qualifies for First Amendment protection.

### 2.    Causation

Defendants further contest the causal connection between Carambot's speech and any adverse employment action such as her administrative leave, PIP, or termination.  "To demonstrate a causal connection a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action."  *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 119 (2d Cir. 2015) (quotation marks omitted).  "A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus."  *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 32 (2d Cir. 2012).  Here, Carambot has alleged sufficient facts to support a causal inference of retaliation.

First, "a plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."  *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (holding that a six-month interval is sufficient to support a casual inference). Carambot has alleged a clear timeline around her adverse employment action:  On August 21, 2023, Carambot sent an email to Fineran, complaining about conditions at Rikers and cautioning that "[p]utting more high-risk patients into these units at this point is just asking for something horrible to happen."  (Compl. ¶¶ 95-96.)  On August 22, 2023, D.U. died in his cell, and Carambot was interviewed by DOC Assistant Commissioner Levine, who came to investigate the death.  (*Id.* ¶¶ 97-98.)  Carambot shared with Levine her concerns about "overcrowding, deliberately indifferent medical treatment of mentally ill detainees, lack of staffing and drugs coming on the units."  (*Id.* ¶ 99.)  That evening, Carambot sent Levine an email explaining her

concerns and forwarded him her August 21 email to Fineran—information that Levine promised

to relay to Commissioner Molina "to see if he could get something done." (*Id.* ¶¶ 100-01.) On

August 23, 2023, Carambot was called into a meeting and placed on administrative leave

because of her "email." (*Id.* ¶ 109.) As soon as Carambot returned from the leave, she was

presented with a PIP. (*Id.* ¶ 113.) One month later, she was terminated. (*Id.* ¶ 120.) The close

temporal proximity between Carambot's latest complaint and the first adverse employment

action—only one or two days—raises a strong inference of retaliation.[5]

Defendants argue that when Laboy referred to Carambot's "email" in placing her on

administrative leave, he was referring to Carambot's email asking for leave, not her email raising

complaints. (Mem. at 26.) However, this is a factual dispute that demands further evidence. It

is true that Carambot requested "discretionary administrative paid leave" by email on August 22,

2023. (Compl. ¶ 102.) But Carambot also alleges that at the August 23, 2023 meeting, when she

suggested that "placing her on administrative leave felt very punitive," Laboy "responded that 'it

makes sense it feels punitive because it is' and that they were putting Carambot on-leave for

'punitive' reasons." (*Id.* ¶ 111.) These remarks support an inference that HHC placed Carambot

on administrative leave in a hostile, rather than accommodating, manner.

Moreover, HHC issued multiple explicit warnings to Carambot regarding the expression

of her concerns. "After the death of E.T., Carambot was directed by HHC and CHS staff to not

discuss issues with the overcrowding and lack of adequate mental health staff and deliberately

indifferent medical treatment of detainees at Rikers with non-employees of the [City] and HHC."

---

[5] The fact that Carambot first started complaining in May 2022 (Mem. at 26) is not
material. Notably, most of her previous complaints were made internally to HHC managers,
whereas her August 22, 2023 complaint was the first one addressed to a DOC Assistant
Commissioner tasked with investigating an inmate's death at Carambot's facility, who then
promised to share those concerns with the DOC Commissioner.

(*Id.* ¶ 76.)  And when Carambot was presented with and refused to sign the PIP, "HHC specifically directed Carambot to no longer express her concerns about the deliberately indifferent medical treatment of mentally ill detainees at Rikers to DOC or any others outside of HHC and CHS."  (*Id.* ¶ 119.)  These direct attempts to curtail Carambot's speech further support an inference of retaliatory animus on the basis of such speech.

Finally, the allegations suggest that the reasons offered for the adverse employment actions against Carambot may have been pretextual.  The PIP discussed Carambot's "excessive attendance issues, lack of communication and documentation in relation to the absences, and unprofessional day-to-day communications and behaviors with coworkers."  (*Id.* ¶ 114.)  However, the complaint alleges that "Carambot's performance evaluations were stellar, receiving 'exceeds expectations' consistently on annual performance evaluations, and she frequently worked over 40 hours a week, without overtime, to attend to her patients' needs."  (*Id.* ¶ 59.)  "[S]he had never received any write-ups, formal verbal warnings or any other indication that her work was lacking."  (*Id.* ¶ 58.)  HHC further claims that it terminated Carambot because "Carambot's team members were dissatisfied with [her], and 'no one wanted to work with her.'"  (*Id.* ¶ 122.)  However, "many of Carambot's colleagues, including the Rikers warden, several supervisors, team members and students were vocally upset about her being fired and have complained in writing about Carambot's . . . termination."  (*Id.* ¶ 123.)  These alleged discrepancies prevent the Court from determining as a matter of law that HHC's actions were not taken in retaliation for Carambot's protected speech.

The Court concludes that Carambot has adequately alleged "a causal connection between [the] adverse action and the protected speech."  *Cox*, 654 F.3d at 272.  Accordingly, Carambot has stated a violation of her First Amendment rights.  The Court next turns to whether she can

establish liability under 42 U.S.C. § 1983 against the municipal and individual Defendants for their deprivation of her First Amendment rights.

### B.    Section 1983 Liability

Carambot asserts Section 1983 claims against HHC, the City, as well as Yang, Fineran, Laboy, Soto, and Molina in both their official and personal capacities.  The Court analyzes the liability of each Defendant in turn.

#### 1.    Municipal Liability

"[W]hen the defendant sued . . . under . . . § 1983 is a municipality—or an individual sued in his official capacity—the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."[6] *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692-94 (1978)).  To survive a motion to dismiss on such a claim, "plaintiffs must do more than 'merely assert' the existence of a municipal policy or custom leading to a rights violation"; instead, they must "actually allege facts 'tending to support, at least circumstantially,' the inference that the complained-of actions were pursuant to a municipal policy or custom."  *Kimble v. Kingston City Sch. Dist.*, 792 F. App'x 80, 82 (2d Cir. 2019) (summary order) (quoting *Montero*, 890 F.3d at 403-04) (brackets omitted).  Carambot has not identified a municipal policy or custom in her complaint.  She alleges only that "[t]he decision to terminate [her] was made by the City, HHC, Yang, Fineran, Laboy, Soto, Molina and others at HHC and DOC" "in retaliation for [her] complaints" (Compl. ¶¶ 121, 127 (capitalization altered)).  Those statements fall short of

---

[6] The same rule applies to HHC.  *See Simpkins v. Bellevue Hosp.*, 832 F. Supp. 69, 73 (S.D.N.Y. 1993) ("As a municipal corporation, NYCHHC's liability under § 1983 is governed by the principles set forth in *Monell v. Department of Social Services* and its progeny.").

pleading a policy or custom of, for example, disciplining HHC employees for criticizing jail conditions.

Plaintiff argues, however, that she has pleaded "a single act by an official with 'final policymaking authority' in a particular area of city business," which "can constitute a municipal policy for purposes of Section 1983 liability." (Opp. at 29 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).) It is true that "[w]here an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy." *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983). But two limitations are pertinent here. First, "with respect to the conduct challenged, [the official] must be responsible under state law for making policy *in that area* of the municipality's business." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (cleaned up). Second, "[i]t does not suffice for these purposes that the official has been granted discretion in the performance of his duties." *Id.*; *see also Praprotnik*, 485 U.S. at 127 ("[T]he authority to make municipal policy is necessarily the authority to make *final* policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." (citation omitted)). Thus, "[t]he critical characteristic of final policymakers when employment is at issue is whether the municipal official has authority to formulate the rules governing personnel decisions rather than authority to make decisions pursuant to those rules." *Chin v. N.Y.C. Hous. Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008); *see also Baity v. Kralik*, 51 F. Supp. 3d 414, 437 (S.D.N.Y. 2014) ("[A] number of courts in the Second Circuit have found that the authority to make individual employment decisions was not sufficient to make an official a policymaker for the purposes of *Monell* liability." (collecting cases)).

Carambot argues that Yang (Senior Vice President of CHS), Fineran (Director of Mental Health Services at Rikers), and Molina (DOC Commissioner) are final policymakers for purposes of her First Amendment retaliation claim.  (Opp. at 29.)  But the complaint is devoid of allegations that either Yang or Fineran has *final* policymaking authority to enact *personnel* rules at HHS.[7]  This deficiency renders the cases cited by Plaintiff distinguishable from this case.  *Cf. Rookard*, 710 F.2d at 45 (holding that the "final" authority over personnel decisions by the Executive Director of Harlem Hospital and HHC's Vice President for Corporate Affairs is evidenced by "[t]he reluctance of HHC's President and General Counsel to intervene, or even to inquire into [the plaintiff's] claims"); *Nagle v. Marron*, 663 F.3d 100, 117 (2d Cir. 2011) (holding that a school superintendent is the final decisionmaker on personnel appointments "because no potential employee can obtain full school board approval without the superintendent's recommendation" (cleaned up)).  On the other hand, while Carambot alleges that Commissioner Molina "was responsible for overseeing Rikers" and "ensuring that . . . HHC staff with Rikers . . . are not subjected to retaliatory practices" (Compl. ¶¶ 42, 45), Carambot has failed to allege in more than a conclusory fashion Molina's involvement in any employment action against her (*see id.* ¶¶ 121, 127-29).

---

[7] Carambot alleges that "Yang was responsible for formulating and implementing CHS-wide policy, such as policies on mental health care and treatment to detainees, clinically appropriate and ethical placement of patients, adequate number of mental health staff required to properly monitor and manage patients and housing of inmate-patients.  At all relevant times, Yang was also responsible for ensuring that employees are not subjected to retaliatory practices." (Compl. ¶¶ 23-24 (capitalization altered); *see also id.* ¶¶ 29-30 (similar language for Fineran).) Notably, the authority to formulate policies on inmate-patient treatment is different from the authority to formulate policies on employment decisions, and the responsibility to ensure compliance with any non-retaliatory rules is different from the final authority to enact such rules.

Therefore, Carambot has not adequately pleaded a *Monell* claim for municipal liability. Her Section 1983 claims against HHC, the City, and the individual Defendants in their official capacities must be dismissed.

### 2.    Individual Liability

While "[o]fficial-capacity liability . . . require[s] proof of a municipal policy or custom," "personal liability . . . require[s] only that [the defendant] himself caused the deprivation of a federal right while acting under color of state law." *McCray v. Cnty. of Suffolk*, 598 F. App'x 48, 50 (2d Cir. 2015) (summary order) (citing *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985)). In other words, "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority.  Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (cleaned up).

Carambot has alleged the personal involvement of Yang, Fineran, and Laboy, but not Soto and Molina, in the deprivation of her First Amendment rights.  Laboy led the August 23, 2023 meeting placing Carambot on a punitive administrative leave.  (*Id.* ¶¶ 109-11.)  At that meeting, Laboy told Carambot that CHS was placing her on leave because "[Yang] wants to give you time to regroup and get your thoughts together to discuss the issues with your behavior." (*Id.* ¶ 110).  And Fineran attended the meeting at which Carambot received a PIP upon returning from administrative leave.  (*Id.* ¶ 113.)  These allegations support an inference that Yang, Laboy, and Fineran were personally involved in HHC's decision to punish Carambot by placing her on leave, giving her a PIP, and terminating her employment.  By contrast, the complaint makes no mention of Molina's or Soto's role in the adverse employment actions against Carambot (*see id.* ¶¶ 102-34), other than in laundry lists such as "the decision to terminate Carambot was made by the City, HHC, Yang, Fineran, Laboy, Soto, Molina and others at HHC and DOC" (*id.* ¶ 121

(capitalization altered)).  Such conclusory allegations, unaccompanied by additional factual detail, are insufficient to survive a motion to dismiss. [8]

Thus, Carambot has stated Section 1983 claims against Yang, Fineran, and Laboy in their personal capacities, but has failed to do so against Soto and Molina.

C.    **New York Civil Service Law**

Carambot also asserts whistleblower and retaliation claims under New York Civil Service Law § 75-b, which "prohibits a public employer in New York State from taking adverse personnel action against a public employee in retaliation for the employee's disclosure of illegal activity."  *Maher v. Town of Stony Point*, No. 16-CV-607, 2018 WL 4759786, at *10 (S.D.N.Y. Sept. 29, 2018) (citing N.Y. Civ. Serv. Law § 75-b).  To state a claim under Section 75-b, a plaintiff must allege

> (1) an adverse personnel action; (2) disclosure of information to a governmental body (a) regarding a violation of a law, rule, or regulation that endangers public health or safety, or (b) which she reasonably believes to be true and which she reasonably believes constitutes an improper governmental action; and (3) a causal connection between the disclosure and the adverse personnel action.

*Morales v. City of New York*, 525 F. Supp. 3d 463, 482 (S.D.N.Y. 2021), *aff'd*, No. 21-925-CV, 2022 WL 2840035 (2d Cir. July 21, 2022).  An "improper governmental action" is defined as "any action by a public employer or employee . . . in violation of any federal, state or local law, rule or regulation."  N.Y. Civ. Serv. Law § 75-b(2)(a).

---

[8] Plaintiff states in her opposition brief that "Carambot's termination letter was signed by Soto in her capacity as Senior Director of Human Resources at CHS."  (Opp. at 29-30.)  This allegation is not found in the complaint, and the Court does not consider it.  *See In re Agape Litig.*, 773 F. Supp. 2d 298, 316 (E.D.N.Y. 2011) ("It is well-settled that a plaintiff cannot amend the complaint through briefs and affidavits, and such facts are thus irrelevant for purposes of determining whether the Plaintiff's complaint should be dismissed for failure to state a claim." (cleaned up)).

Defendants contend that Carambot has failed to meet the second element of a Section 75-b claim, because "all of the issues that Plaintiff complained to [HHC] about were not illegal under any law." (Mem. at 31.)  That is plainly incorrect.  Carambot repeatedly complained that the treatment of inmate-patients at Rikers was "deliberately indifferent." (*E.g.*, Compl. ¶¶ 70, 82, 83, 89, 90, 99, 105.)  "When the state is deliberately indifferent to the medical needs of a person it has taken into custody, it violates the Eighth Amendment's prohibition on cruel and unusual punishment." *Charles v. Orange Cnty.*, 925 F.3d 73, 82 (2d Cir. 2019).  Thus, Carambot's reporting of her concerns falls squarely within the protection of Section 75-b.[9]

Accordingly, Carambot has stated a Section 75-b claim.

### D. Leave to Replead

Plaintiff requests leave to replead any claims that the Court deemed factually deficient. (Opp. at 32.)  Leave to amend should be freely given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see* Fed. R. Civ. P. 15(a)(2).  Plaintiff has not amended her complaint before, and the deficiencies in her complaint could conceivably be remedied by additional factual allegations showing that individual defendants possessed final policymaking authority or that Molina or Soto were personally involved in the retaliation against Carambot.  Thus, Plaintiff is granted leave to replead if she wishes to do so.  Alternatively, she may file a letter stating that she intends to proceed on the

---

[9] Defendants also state passingly that "[i]n any event, Plaintiff also fails to establish the required causal nexus between her alleged disclosures and her adverse actions to properly plead a Section 75-b claim." (Mem. at 32.)  Carambot has adequately alleged the requisite causal connection for the same reasons explained in Section III.A.3.

surviving claims, in which case the remaining Defendants shall file an answer within 14 days of the filing of such letter.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Plaintiff is granted leave to amend, provided that any amended complaint must be filed within 21 days after the date of this Opinion and Order.  If Plaintiff chooses not to file an amended complaint, she shall file a letter so stating, in which case Defendants shall file an answer within 14 days after the filing of such letter.

The Clerk of Court is directed to close the motion at Docket Number 26.

SO ORDERED.

Dated:  March 10, 2025
New York, New York

_____
J. PAUL OETKEN
United States District Judge